IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WALTER JACKSON | ) | |
| Petitioner, | ) | No. C 10-4014 CRB (PR) |
| vs. | ) | ORDER  DENYING |
| | ) | PETITION FOR A WRIT OF |
| GREG LEWIS, Acting Warden, | ) | HABEAS CORPUS |
| Respondent. | ) | |

Petitioner, a state prisoner at California State Prison, Solano, in Vacaville, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction and sentence from Contra Costa County Superior Court.  For the reasons set forth below, a writ of habeas corpus will be denied.

**STATEMENT OF THE CASE**

Petitioner was convicted by a jury of first degree murder.  On November 21, 2007, he was sentenced to an indeterminate term of 25 years to life, to be served consecutively with a previously imposed five-year term for arson arising out if the same incident.

On May 25, 2009, the California Court of Appeal affirmed the conviction and denied petitioner's request for state habeas relief.

On August 12, 2009, the Supreme Court of California denied review and, on June 23, 2010, denied petitioner's final application for state habeas relief.

On September 7, 2010, petitioner filed the instant petition for a writ of habeas corpus under § 2254.  Per order filed on February 14, 2011, the court found the claims cognizable, when liberally construed, and ordered respondent to show cause why a writ of habeas corpus should not be granted.  After several extensions of time, respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

> The body of the victim in this case, 82-year-old Cora Morgan, was found by firefighters who had come to her apartment on December 29, 2004, to put out a fire.
>
> On December 30, 2004, and autopsy was performed on the victim.  She was dressed in a nightgown and a sweatshirt and had burn injuries on the outside of her body and blood in the mouth and nose area.
>
> The victim did not, however, die of smoke inhalation.  She was asphyxiated before the fire ever occurred.  Her "upper airway was obstructed by . . . wadded material at the back of her throat . . . ."  In addition, she had injuries to her neck and throat that were "consistent with manual strangulation."  Either of these could have killed her.  There were also injuries to the front of her lips which indicated that "she could have had a hand held over her mouth as well."
>
> The victim sustained other injuries before she died.  She was bruised on the front left shoulder, which was evident from an internal examination.  The victim also "had an area of bleeding under the scalp at the back of the head."  There were also "tears to the mucus membrane lining the mouth . . . and a small amount of bleeding" which could have been the result of the "lips being pushed against the teeth, a blow to the mouth . . . being struck in the mouth or perhaps a combination of the two."  The victim also had a "slight fracture between the fourth and fifth spinal segments fo her neck" which was not related to the asphyxiation but, rather, "is something that you could see from a number of circumstances, the individual perhaps taking a fall and causing a crack to occur there."
>
> The fire in the two story apartment was the result of three separate fires, each set intentionally – two in upstairs bedrooms by

2

burning candles and one downstairs in the kitchen.  The victim's body was found downstairs, in the kitchen, where the worst of the fire damage occurred.

When they found the body, firefighters notified Walnut Creek police officer Carol Burroughs, who was on the scene to provide traffic control for the firefighters.  Burroughs learned that earlier that evening a man had inquired about the person inside the apartment.  This man, accompanied by a woman, approached Burroughs shortly after she learned of the victim's death.  Burroughs identified the man as defendant.  The woman with defendant was the victim's daughter and defendant's wife, Pam Jackson.  Burroughs told Pam Jackson that her mother had died in the fire.  Pam Jackson was very upset and fell to the ground.  Defendant comforted her.

It was raining and Burroughs offered to let defendant and Pam Jackson sit in her car.  As Burroughs was accompanying defendant and Pam Jackson to her car, defendant "made a comment . . . that the victim was always angry at him and evidently was kicking him out of the apartment."

Randy Dickey, a police officer for the City of Walnut Creek was assigned to lead the investigation into the victim's death.  Dickey interviewed defendant at the police station at around midnight the night of the victim's death.  Another officer spoke with Pamela Jackson.  Although they were indoors, defendant kept his parka on, zipped up to the neck.  He also kept his hat on.  Defendant told Dickey he wasn't at the house when the fire started.  He claimed not to know how the fire started.  He described the victim, who was his mother-in-law, as a very healthy woman.  Defendant said he had a strained relationship with the victim, that he tried to please her, but she was not very flexible to his needs.  The victim had just told him that he needed to move out of the apartment.

Defendant told Dickey he suspected the victim's death had not been an accident.  "[H]e said that he had received this mysterious letter from someone in his past that said that 'You'll be blamed' and 'Remember Beasley.'"  During this interview, defendant never took his jacket off although Dickey asked him several times if he would do so.  At one point, Dickey asked defendant if he could photograph defendant.  Defendant allowed Dickey to take one photograph, but would not unzip his jacket or take it off.

Defendant and Pamela Jackson were taken to a hotel at around 3:00 or 4:00 that morning.  Dickey learned later that morning that the victim's death was a homicide.  Dickey reinterviewed defendant.  The interview was videotaped.  Dickey told defendant that the victim had been murdered.  He did not give defendant any other details about the murder.  He also told defendant that the fire in the apartment was arson.

3

Defendant repeated his original statement about what he had been doing the day of the victim's death.  Defendant then indicated he wanted to speak to Pamela Jackson.  Dickey thought Jackson "knew what the truth was, and she wanted to convince [defendant] to tell us the truth about what had happened to [the victim]."

Jackson asked Dickey to remain in the room during her conversation with defendant.  Jackson asked defendant to "tell her the truth."  Defendant leaned forward and whispered in her ear.  Jackson "started to cry and said that she could have peace now and thanked him for telling her what happened.  Dickey heard defendant say "She kept coming at me.  She kept coming at me." Defendant also gestured with his arm "like he was trying to get somebody away or strike somebody with an elbow."  At some point, defendant also mentioned something about a knife and that "she just wouldn't let . . . him go."

Dickey did not hear all of the conversation between Jackson and defendant because defendant was whispering to his wife. Defendant told his wife not to tell anyone what he had said.

Dickey observed defendant's arms during this interview.  He noticed "some semicircular gouges" on his "inner elbow, inner arm area" on both arms.  "There appeared to be fingernail gouges from somebody grabbing an arm."  Defendant explained these injuries by saying that he had climbed over a fence to try to get into the apartment.

Dickey asked defendant how the victim had died and defendant told him "'[s]he was strangled.'" When Dickey asked him where defendant strangled the victim, defendant "backs away and said he wasn't involved and he didn't do anything . . . and ultimately that he didn't want to talk to us anymore about it."  Defendant was arrested and transported to jail.

A Sergeant Edwards interviewed defendant again after his arrest, while Dickey monitored the interview from the room next door.  The interview was videotaped.  During this interview, defendant admitted involvement in the victim's death.  Defendant told Edwards the victim "had approached him at the top of the stairs, and that he had made a motion back which knocked her down the stairs."  "[H]e dragged her on a rug into the kitchen, and then strangled her and forced a wad of dinner napkins, holiday napkins, down her throat."  He also said the victim wasn't dead so he "cut off a cord from an electrical toaster that was there in the kitchen and used the toaster to tie around her neck.  And he did this at least two – I think three times, and each time when he released the cord, he saw some blood bubbles come out of her nose.  And he thought that she was still alive, so he reapplied the electrical cord to finish the job, and then ultimately the napkins."  The cord was never found.  Defendant explained that the victim was still alive after the fall down the stairs, and that he strangled her because he

4

felt he would be blamed for the fall and "he did not want to go back to prison."  Defendant set the fire because "he wanted to cover it up so it made it look like he wasn't there."

Defendant was returned to jail.  That night, he spoke to Walnut Creek Police Officer Vevera.  Vevera, who had listened to the conversation between defendant and his wife, told defendant he'd heard him admit that he had elbowed the victim, "that she started bleeding and that he panicked."  Defendant said, "Oh you must really have heard that then."

Walnut Creek Police Sergeant Edwards spoke to defendant shortly after defendant had been informed of the victim's death. Defendant asked Edwards if he suspected "foul play" and told him that he (defendant) had beat somebody up several years earlier and had received, three months before the victim's death, a threatening letter to the effect that defendant was "going to be blamed for this." Defendant also referred to the victim as a "bitch and a nasty woman."  Edwards asked defendant if he suspected anyone of killing the victim, and defendant said he should check into his wife's "associates."  At some point during the investigation, Edwards confirmed that Pamela Jackson was working at the time the fire occurred.

Defendant was interviewed a third time.  This interview was conducted by Edwards and took place on January 3, 2005. Defendant admitted to Edwards that he was "the sole responsible" for the victim's death.  This interview was videotaped and, in the interview, defendant contradicted a statement he'd made earlier to the effect that the victim had pulled a knife on him.  Defendant told Edwards that the victim had fallen down the stairs.  She wasn't badly injured.  Defendant said he "panicked" because "he was afraid he was going to go to jail for the rest of his life."  He thought about calling 911 after the victim fell down the stairs, but instead "dragged her away from the door."

The jury was shown a videotape of excerpts from the January 3, 2005, interview.  In these excerpts, defendant admitted that he dragged the victim into the kitchen after she fell down the stairs.  He strangled her with a cord.  Not sure if the victim was dead, defendant put napkins in defendant's [sic] mouth.  He put blankets around her and then tried to put them in the stove so her body would burn.

At trial, defendant admitted to setting the fire, but testified that he had lied in his earlier confessions to killing the victim.  He stated that his mother-in-law did not "have not one mark . . . bruise on her neck, period, that was made from a human being while she was alive."  Defendant testified that "I hit her [the victim's] arms and throw her over a little bit. . . . [¶] We were at the top of the stairs.  She swung.  Something happened that caused her to go back against the wall and do – kind of grab her chest and she went down

5

the stairs. [¶] That's what happened.  That's the reality fo it. [¶] And the other reality of it . . . is that I was completely not in my right state of mind at this interview.  I was – I wasn't in my right state of mind.  I wasn't because I just wanted to just convict myself. [¶] But I was also on suicide watch.  I was on suicide watch.  I believe I had even made a news – I had made a noose, and I was going to put it around my neck and tie it to the – tie it to the cell, tie it to the bars in the unit and jump off the tier and break my own neck. [¶] That was just before this . . . .  People arrived and pulled me into the room and started doing the interview with me.  That's where my mind was at. [¶] So when I got in that room, I couldn't physically kill myself, but I was doing everything I could emotionally, psychologically and verbally to kill myself."

People v. Jackson, No. A120092, 2009 WL 1482217, at **1-4 (Cal. Ct. App. 2009) (Resp't Ex. H).

## STANDARD OF REVIEW

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'reasonable application clause,'

a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## CLAIMS & ANALYSIS

Petitioner raises three claims for relief under § 2254: (1) prosecutor withheld a toxicology report; (2) denial of a speedy preliminary hearing, as required by state law; and (3) ineffective assistance of counsel based on counsel's failure to investigate toxicology reports. The claims are without merit.

A.      Suppression of Toxicology Report

Petitioner claims that the prosecution withheld a toxicology report from Dr. Gregory Reiber, a forensic pathologist who testified to the victim's injuries

and cause of death.  According to petitioner, Dr. Reiber's findings – namely that the victim was asphyxiated – was flawed because Dr. Reibert did not receive and examine the toxicology report before determining the cause of death.

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).

"There are three components of a true Brady violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  "[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Id. at 281.

Petitioner's claim fails because he does not show that the toxicology report was exculpatory or otherwise favorable to him.  The report petitioner points to notes that food particles were isolated from a blood clot found in the victim's airway.  See Traverse Ex. A at 4 ("May 2, 2005 Report").  At trial, Dr. Reiber testified that he investigated the obstruction in the victim's airway to ensure that the victim did not choke on food.  See Resp't Ex. B at 613-14.  This is consistent with the May 2, 2005 Report's finding that the food particles were so small that they were detected only with the help of a microscopic. Nothing in the May 2,

8

2005 report (or any other toxicology report in the record) undermines Dr. Reiber's conclusion that the victim did not choke on food, or the California Court of Appeal's determination that the report "does not suggest in any way that the food particles discovered in the airway material led to the victim's death." People v. Jackson, slip op. at 11.

In view of the limited value of the May 2, 2005 Report (or of any other toxicology report in the record) to the defense, it simply cannot be said that the alleged "nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Strickler, 527 U.S. at 281.  Nor can it be said that the state court's rejection of petitioner's claim was contrary to, or an unreasonable application of, Brady and its progeny, or was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.

B.      Denial of Speedy Preliminary Hearing

Petitioner claims that he was denied his right to a speedy preliminary hearing under California Penal Code section 859b.  The claim is without merit because it is well-established that "federal habeas corpus relief does not lie for errors of state law."  Estelle v. McGuire, 502 U.S. 62, 67 (1991).[1]

C.      Ineffective Assistance of Counsel

Petitioner claims ineffective assistance of counsel based on trial counsel's failure to investigate toxicology reports that would have shown that the victim's death was accidental.  The claim is without merit.

---

[1]No federal constitutional right is implicated by the state requirement for a speedy preliminary hearing either.  Although the Sixth Amendment guarantees the accused the right to a speedy trial in all criminal prosecutions, it has no application until the putative defendant becomes an accused.  See United States v. Marion, 404 U.S. 307, 313 (1971).

9

To prevail on a claim of ineffective assistance of counsel, petitioner must pass the two-part test set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984).  Petitioner must demonstrate that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "counsel's deficient performance prejudiced the defense."  Id. at 687-88.  Concerning the first element, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Hence, "judicial scrutiny of counsel's performance must be highly deferential."  Id.  To fulfill the second element, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome.  Id.

For a federal court reviewing a habeas petition brought by a state prisoner, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable," which "is different from asking whether defense counsel's performance fell below Strickland's standard."  Richter v. Harrington, 131 S. Ct. 770, 785 (2011).  "The standards created by Strickland and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so."  Id. at 788.  The court must ask not "whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Id.

Petitioner's ineffective assistance of counsel claim is without merit because the state courts' rejection of the claim was not objectively unreasonable.  See 28 U.S.C. § 2254(d).  The California Court of Appeal determined that the reports petitioner cited "were of no assistance in showing that the victim died accidentally."  People v. Jackson, slip op. at 12.  The May 2, 2005 Report did

"not suggest in any way that the food particles discovered in the airway material led to the victim's death," and another report petitioner summarized (put did not produce) did not "even so much as suggest that the victim's death was accidental." Id. at 11.  Consequently, the court concluded that petitioner had not carried his burden of establishing prejudice because there is "no reasonable probability that [the reports] would have altered the outcome of these proceedings." Id. at 12.  The state court's application of the Strickland standard was not unreasonable.  See Richter, 131 S. Ct. at 785.  After all, the jury had before it extensive and quite convincing evidence that the victim dies of asphyxiation after petitioner choked her with a cord and then stuffed paper napkins down her throat.  Petitioner is not entitled to federal habeas relief on this claim.

## CONCLUSION

After a careful review of the record and pertinent law, the court is satisfied that the petition for a writ of habeas corpus must be DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED:   April 11, 2012

CHARLES R. BREYER
United States District Judge

N:\10-4014.crborder.wpd

11